NOT DESIGNATED FOR PUBLICATION

No. 123,639

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of S.F.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Shawnee District Court; RACHEL L. PICKERING, judge. Opinion filed November 12, 2021. Affirmed.

*Rebekah A. Phelps-Davis*, of Phelps-Chartered, of Topeka, for appellant natural mother.

*Morgan L. Hall*, deputy district attorney, for appellee.

Before ATCHESON, P.J., BRUNS and ISHERWOOD, JJ.

PER CURIAM: This is an appeal from the district court's order terminating the parental rights of Mother to S.F. (YOB 2015). The district court found Mother was unfit, her unfitness was unlikely to change in the foreseeable future, and termination of parental rights was in the child's best interests. Mother contends: (1) the State failed to present clear and convincing evidence to support a finding of unfitness and that such unfitness was unlikely to change in the foreseeable future, and (2) the district court abused its discretion in finding that termination of parental rights was in the child's best interests. After carefully reviewing the record, we find clear and convincing evidence to support the district court's findings that Mother was unfit as a parent under Kansas law and that the conditions leading to the unfitness were unlikely to change in the foreseeable future. We also find no abuse of discretion in the district court's conclusion that termination of

1

Mother's parental rights was in the best interests of the child. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On June 23, 2016, the Department for Children and Families (DCF) filed a petition alleging S.F., a minor child born in 2015, to be a child in need of care (CINC) pursuant to K.S.A. 2020 Supp. 38-2202(d)(1) and (d)(2). Mother was admitted to Stormont Vail West after attempting suicide twice in the two weeks preceding the filing of the CINC petition, one attempt by drowning and one attempt by overdosing on medication. Mother reported to the responding DCF investigator that she suffers from depression and bi-polar disorder. Mother admitted that she smoked marijuana with S.F. in the other room, and she admitted to kicking the bouncer that S.F. was in because the child was screaming and crying. Mother reported that S.F.'s father was incarcerated. She refused to sign a safety plan but agreed to work with family preservation services.

That same day, S.F. entered into emergency protective custody with the Secretary of DCF. The court held a temporary custody hearing and found that an emergency existed which threatened the safety of the child, and she was likely to sustain harm if not removed from the home because of Mother's mental health condition and recent suicide attempts. The court also noted Mother's use of prescription medications and marijuana while caring for the child, and that Father could not help care for the child because he was incarcerated. S.F. was ordered into the State's custody, and DCF placed the child in the care of her maternal grandmother.

The court conducted an adjudication hearing on July 25, 2016, at which Mother appeared in person and entered a stipulation that S.F. was a CINC. The district court delayed disposition to address Father's request for genetic testing to determine paternity. S.F. remained in State custody. On November 7, 2016, at an adjudication hearing

2

concerning Father, paternity was established, and Father entered a stipulation that S.F. was a CINC. The court proceeded to disposition, approved the proposed permanency plan of reintegration and ordered DCF to retain custody of the child.

Permanency hearings were held on May 8, 2017, and again on April 2, 2018, to assess Mother's progress toward reintegration, and the district court found it remained adequate. A review hearing was conducted on July 9, 2018, and the district court ordered a change in the permanency plan to a dual goal of reintegration and adoption. It did not enter a finding on whether reintegration remained a viable option. The court held another review hearing on October 22, 2018, at which time the court reaffirmed its earlier change of the case plan goal.

At a permanency hearing conducted on February 25, 2019, the court again concluded that Mother's progress toward reintegration was not sufficient. It concluded that reintegration was no longer a viable option and the permanency plan for the child was modified to an adoption only goal. The district court held a review hearing on June 10, 2019, and ordered the State to file a motion to terminate parental rights within 30 days after the hearing.

The State complied with that directive and filed a motion for finding of unfitness and termination of parental rights or appointment of permanent custodian in which it alleged five factors supporting its claim that the parents were unfit:

- emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental, and emotional needs of the child (K.S.A. 2020 Supp. 38-2269[b][1]);
- physical, mental, or emotional abuse or neglect, or sexual abuse of a child (K.S.A. 2020 Supp. 38-2269[b][4]);

3

- lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or condition to meet the needs of the child (K.S.A. 2020 Supp. 38-2269[b][8]);
- failure to maintain regular visitation, contact, or communication with the child or with the custodian of the child (K.S.A. 2020 Supp. 38-2269[c][2]); and
- failure to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home (K.S.A. 2020 Supp. 38-2269[c][3]).

The State also included a presumption of unfitness because, at that time, S.F. had been in out-of-home placement longer than two years. K.S.A. 2020 Supp. 38-2271(a)(6). Mother and Father were served with the motion to terminate parental rights.

Another review hearing was held on November 4, 2019, and the parents requested that the motion to terminate parental rights be set for trial. Two months later, the parents expressed frustration over an inability to have visitation with S.F., as well as the lack of a contact person with the agency who could help them schedule visitations. The parents were provided with the name of the caseworker and the phone number for the agency.

A permanency hearing was held on February 18, 2020, and the goal continued to be adoption. The matter was set for trial to start on April 1, 2020, but on March 17, 2020, the district court held another review hearing and determined good cause existed to continue the trial due to public health concerns arising from the COVID-19 pandemic. At a review hearing conducted two months later the district court informed the parents that the termination hearing would begin on July 14, 2020.

A termination hearing was held July 14 through 16, 2020. At the outset of the proceedings Father relinquished his parental rights.

4

The State called Levi Jenkins as one of its early witnesses. Jenkins worked as a child protection specialist and was assigned to S.F.'s case in June 2016. He testified that the first report he received reflected that the child smelled like marijuana and there was mold around the ring of her bottle. He informed the court that the focus of the investigation then shifted to Mother's mental health. He testified that Mother had tried to commit suicide and had kicked S.F.'s bouncer seat while the child was in it and caused her to fly up in the seat as a result of the contact. Mother admitted to Jenkins that those incidents occurred and that she used marijuana while S.F. was in her care. After speaking with Mother, Jenkins was concerned that S.F. did not have a safe caregiver, so he initiated an investigation, assigned a child protection investigator to the case, and filed a formal CINC petition.

Elizabeth Gilbert served as the case manager from September 2016 to September 2019 and testified that she developed a case plan in October 2016 designed to reintegrate S.F. into Mother's home. As part of the plan, Gilbert provided tasks for Mother to complete that included the obligation to (1) maintain stable housing that was free from abuse and drugs, had adequate space for S.F., and met certain minimal standards of cleanliness; (2) maintain a source of sufficient income to meet the child's needs; (3) submit to monthly UAs or hair tests; (4) maintain monthly contact with the agency; (5) inform the agency of any changes to contact information; (6) participate in individual therapy and follow the recommendations; (7) schedule a drug and alcohol assessment and follow recommendations; (8) enroll in parenting class and implement the parenting skills during visits with the child; (9) explore services at the center for safety and empowerment and follow all recommendations; and (10) attend a vocational rehab orientation and explore the opportunities.

In March 2018, Gilbert prepared a report documenting Mother's progress. She testified that Mother had completed many tasks, such as maintaining stable housing and employment, however, she failed to continue participating in mental health services

5

which was a critical factor given her history. Mother had also been permitted to have S.F. for some overnight visits, but there were concerns over the fact that Mother allowed individuals in the house who did not complete the required background checks. Gilbert also noted that Mother would not follow through with the overnight visit every time. Rather, she became overwhelmed caring for S.F. and asked the child's grandmother to come and get her prior to the scheduled end of the visit. The overnight visits were terminated based on these concerns.

Gilbert testified that for the span of a few months Mother did not maintain contact with the agency, which slowed the reintegration efforts. Gilbert's primary concern during that time was that Mother was not attending individual mental health therapy. She noted that Mother did complete a parenting class, but still had moments where she became overwhelmed and stopped caring for the child. Gilbert testified that Mother was capable of appropriately interacting with S.F., but not for extended periods of time. She also stated that if Mother remained committed to her mental health care, she would be in a better position to care for the child properly.

In June 2018, almost two years after S.F. was placed in protective custody, Gilbert prepared another report documenting Mother's progress. At that time, Mother was not having any visitation with S.F. because she had not maintained contact with the agency. Gilbert also testified that Mother suffered another suicide attempt in May 2018, and because of mental health concerns, any visitation with the child needed to be supervised. She explained that the need for supervised visits caused Mother's plan to begin anew if reintegration was the goal. And Mother still was not attending individual therapy. Gilbert worried about the amount of time that S.F. had been in DCF's custody and that Mother made very little progress toward reintegration during that period. Gilbert recommended a dual goal of reintegration/adoption so that the child could have an opportunity for permanency in the event Mother was unable to make progress toward reintegration.

In October 2018, Gilbert prepared another report documenting Mother's progress and noted that Mother failed to maintain contact with either Gilbert or the agency for the immediately preceding three months. At the time the report was drafted, Mother could enjoy supervised visits with S.F. in grandmother's presence. However, grandmother reported concerns about Mother's interaction with the child, in that she often parented from the couch and spent time on her phone rather than getting up and attending to S.F.'s needs. Additionally, Mother still struggled with parenting periods that extended beyond a couple of hours and her interaction and discipline of the child in response to normal toddler behaviors was inconsistent. Gilbert observed that while Mother had not received permission to extend her visits with S.F., she also had not reached out to the agency seeking to increase either the duration or frequency of her visitation. Further, when S.F. underwent surgery in 2018, Mother did not attend even though she had received permission to do so. Gilbert also reported that Mother had appropriate housing but was once again unemployed. Additionally, while Mother did threaten suicide in September 2018, fortunately she had also taken the initiative to resume therapy and follow a prescribed medication regimen. At the conclusion of her report, Gilbert recommended that adoption be the singular goal for the case given the length of time S.F. had been in DCF custody, that there continued to be concerns surrounding Mother's mental health, and that Mother failed to make a meaningful measure of progress toward reintegration.

Gilbert reported on Mother's progress again in February 2019. At that point, Mother's visits with S.F. often involved reliance on grandmother to intervene and parent the child. Grandmother wanted to encourage Mother to rely on her own parenting skills, so the agency returned Mother's visits with S.F. to its office. Mother's visits with S.F. achieved a level of consistency as did her contact with the agency. Also, at the favorable end of the spectrum, Mother continued to address her mental health issues, including undertaking the process to enter individual therapy. Gilbert acknowledged that Mother completed a portion of the case plan goals, but adoption remained her sole

recommendation because Mother had not yet made what Gilbert would classify as appreciable progress toward reintegration.

Gilbert's next progress report was dated June 2019, which was three years after S.F. was placed in DCF custody. At this time, Mother had progressed to community visits with S.F., such as outings at the park, and Gilbert noticed an improvement in Mother's interactions with the child. However, it also was not uncommon for Mother to cancel visits with S.F., and she had yet to ask about the possibility of increasing her visitation with S.F. Mother continued to struggle with mental health issues and at the time of Gilbert's report, was waiting for an assignment to a new therapist as the one she had been seeing passed away. It remained Gilbert's opinion that given the time S.F. had been in custody, Mother's inability to manage extended visits with the child, and Mother's ongoing struggle with mental health issues, that adoption was in the child's bests interests. Gilbert testified that grandmother and S.F. shared a strong relationship and grandmother was an adoptive resource for her.

Alexandra Hilliard, a permanency supervisor, testified that she was involved in the child's case from October 2018 to December 2019. In September 2019, Hillard prepared a report documenting Mother's progress. At that time, Mother was sharing only supervised visits with S.F. once a month because the agency still harbored concerns for the child's safety. Hilliard testified that after three and a half years in placement, extended visitation should be occurring with significant progress toward reintegration. Yet Mother remained unable to manage overnight visits with S.F. or care for the child for extended periods of time because she still got overwhelmed and required grandmother's assistance. According to Hilliard, Mother's inability to care for the child for long periods of time was a barrier toward reintegration. Mother was also no longer receiving therapy. The case plan goal remained limited to adoption mainly as a result of Mother's inability to parent S.F. for a prolonged amount of time.

Hilliard prepared a second report roughly a month later and noted that during the preceding month Mother's ability to parent S.F. had not improved so, correspondingly, she had not made progress toward increased visitation. Additionally, Mother continued to not attend therapy or otherwise address her mental health issues. Hillard expressed concern that the case was essentially stagnant because Mother was not making progress toward reintegration. She again recommended adoption, under the belief that it was in the child's best interests.

Becky Mauer, a permanency supervisor, testified that she was assigned to S.F.'s case from February 2020 through April 2020. According to her February 2020 report, Mother was no longer seeing S.F. on a visitation schedule set by the agency but was simply visiting with the child informally whenever the grandmother would transport Mother to appointments or run errands. Nor did Mother maintain consistent contact with the agency from October 2019 to February 2020. It troubled Mauer that Mother still did not participate in a mental health treatment regimen. Mauer adhered to a case plan goal of adoption because of continued concerns about Mother's mental health status and the time S.F. had been in DCF custody.

Karen Olson-Thomas, an adoption case manager, also prepared a report for the court for the termination proceedings. Olson-Thomas informed the court that she became involved in the case in April 2020, but she had only spoken with Mother one time, in June 2020. At that time, Mother still did not attend therapy or take medication to manage her varied mental health issues. Even so, Olson-Thomas stated that reintegration should be considered along with adoption.

LuRita Boggs, a permanency supervisor, became involved with S.F.'s case in April 2020, one month before the termination proceedings. Boggs testified that given her limited involvement she did not feel it was appropriate for her to make a recommendation about the appropriate disposition for the case. Even so, she would not be comfortable

9

sending the child to live with Mother at that time. According to Boggs, following the passage of more than four years, the case should have either gone to reintegration or termination. Boggs testified that she did not believe it was in S.F.'s best interests to be reintegrated with Mother because of how long the child had spent in DCF custody.

S.F.'s maternal grandmother testified that she accepted custody of the child when she was six months old and that is where she has remained. The grandmother informed the court that sometimes Mother goes "to dark places, and has doubts about herself and her capabilities," so she has concerns about Mother caring for S.F. on a full-time basis. She testified that during supervised visits between Mother and S.F., Mother sometimes required assistance in caring for the child. Other times, Mother would try to parent from the couch rather than getting up and interacting with S.F. That said, grandmother did believe that Mother's parenting skills had improved, as evidenced by her increased patience with S.F. Grandmother stated she believed it is in S.F.'s best interests to remain in her home and she would be willing to adopt S.F. if Mother's rights were terminated. She informed the court that she had concerns about S.F. living with Mother full-time but would encourage S.F. to maintain a relationship with Mother.

Mother testified that after her therapist's death, she stopped taking her medication and experienced a marked improvement in her mental health. While she continued to suffer dark periods and occasional bouts of depression, she no longer experienced suicidal ideation and had not attempted suicide in about two years. Mother informed the court that she underwent a new mental health evaluation a few days before the termination proceedings and the evaluator did not recommend that she either attend therapy or take medication. Additionally, Mother testified that she recently moved in to a two-bedroom apartment with her brother, an arrangement that would enable S.F. to have her own room. Mother also shared with the court that she had secured full-time employment and already took the initiative to inform her boss that if she regained custody of S.F., she could not work the evening shift. Finally, Mother testified that her parenting

10

skills had improved, and she had learned to be more patient with S.F. She explained to the judge that she loves her daughter and would like the opportunity to begin anew with her. Mother acknowledged that reintegration was not a possibility if she did not complete the case plan tasks.

On December 7, 2020, the district court filed an order terminating Mother's parental rights to S.F., finding Mother unfit by reason of conduct or condition which renders the parent unable to care properly for the child. Although the State asserted a presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(5) in its petition and in response to the motion to dismiss, it ultimately abandoned its assertion of the presumption. The court found that the factors of unfitness set out against Mother are supported by clear and convincing evidence and are unlikely to change in the foreseeable future. The court also determined that termination of parental rights is in the best interests of the child. Mother's appeal brings the matter to us.

ANALYSIS

Mother argues that the district court erred by terminating her parental rights because there was not clear and convincing evidence to support the finding that she was unfit and that her unfitness was unlikely to change in the foreseeable future. She challenges every factor that the district court cited to support a finding that she was unfit as well as its conclusion that the condition was unlikely to change. She seeks reversal of the termination order. In response, the State contends that sufficient evidence supported the district court's findings, and that termination of Mother's parental rights to S.F. was appropriate.

The Revised Kansas Code for Care of Children provides that the district court may terminate parental rights only after it first makes three specific findings: (1) the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or

11

condition which renders the parent unable to care properly for a child; (2) the conduct or condition that makes the parent unfit is unlikely to change in the foreseeable future; and (3) by a preponderance of evidence terminating the parental rights is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(a), (g)(1); see *In re D.H.*, 54 Kan. App. 2d 486, 488, 401 P.3d 163 (2017).

Parents who have assumed parental responsibilities "have a fundamental right to raise their children that is protected by the United States Constitution and the Kansas Constitution. [Citation omitted.]" *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018); see *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 599 (1982). In Kansas, when a child has been adjudicated to be a child in need of care, a district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a). The court may make the fitness findings based only on clear and convincing evidence, so it is our obligation on appeal to determine whether clear and convincing evidence supports the district court's findings. K.S.A. 2020 Supp. 38-2269(a). To do so, we analyze whether the evidence, viewed in the light most favorable to the State, could have convinced a rational fact-finder that these facts were highly probable. In making this determination, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine factual questions. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430-31, 242 P.3d 1168 (2010); *In re K.L.B.*, 56 Kan. App. 2d 429, 445, 431 P.3d 883 (2018).

In addition, a court reviewing the termination of parental rights must also determine based upon a preponderance of evidence "whether termination of parental rights . . . is in the best interests of the child" by primarily considering the child's physical, mental, and emotional needs. K.S.A. 2020 Supp. 38-2269(g)(1); *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). "If the physical, mental or emotional

12

needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 2020 Supp. 38-2269(g)(1).

In June 2016, when S.F. was six months old, Mother stipulated that she was a CINC and Mother does not dispute that issue on appeal. Essentially, she contends that because she completed a portion of the case plan tasks assigned to her, the State failed to present clear and convincing evidence that she was unfit. She also challenges whether the agencies involved made reasonable efforts to reintegrate her with her child.

K.S.A. 2020 Supp. 38-2269(b) provides a list of nonexclusive factors a court shall consider as part of the unfitness calculus. The district court must also contemplate a separate list of nonexclusive factors when a child is not in the parents' physical custody, such as in this case. K.S.A. 2020 Supp. 38-2269(c). Any one of the factors set forth in K.S.A. 2020 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2020 Supp. 38-2269(f). In deciding whether termination is in the best interests of the child, the district court should give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2020 Supp. 38-2269(g)(1).

With these standards in mind, we turn to the merits of Mother's appeal. Here, the State presented evidence regarding five factors to prove that Mother was unfit.

*1. Emotional illness, mental illness, mental deficiency, or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental, and emotional needs of the child (K.S.A. 2020 Supp. 38-2269[b][1]).*

The State presented evidence that Mother attempted suicide on at least three occasions and threatened suicide at least one other time. Mother admits that she struggles with various forms of mental illness including, post-partum depression, bipolar disorder, PTSD, anxiety, and severe depression.

13

Mother's case plan required her to attend individual therapy and follow all recommendations. Throughout the case, Mother did not consistently participate in mental health services. At one point the mental health provider dismissed her as a client because she failed to attend appointments. Mother eventually resumed treatment but following the death of her therapist, the provider again placed Mother on probation for 90-days as a result of missed appointments.

At trial, Mother testified that she stopped taking her medications but experienced a result in that she suffered fewer "dark" phases and depressive episodes. Additionally, a period of about two years had passed since she had attempted suicide or experienced suicidal ideation. Maternal grandmother testified that during Mother's "dark" phases Mother gets depressed and withdraws. According to the grandmother, Mother suffered around six of these periods in the year before trial and during two of those Mother would not have been able to care for S.F.

The court also received evidence that Mother could not care for or attend to S.F.'s needs for extended periods of time. On those occasions when Mother got the chance to share in overnight visits with S.F. she often got overwhelmed and called grandmother to come pick the child up. Mother testified that she had eight overnight visits with her daughter and had to call grandmother during more than three of those because caring for S.F. proved to be too much for her. The court also heard testimony from the agency that Mother's inability to parent the child without becoming overwhelmed was tied to her mental illness. The agency returned Mother's visits back to supervised status to ensure S.F.'s safety was not compromised.

Mother admitted that she was not attending therapy or taking medication as required by the case plan, but she points to her improved mental health in arguing that the district court erred in finding sufficient evidence to support this factor. Although there is evidence in the record that Mother's mental health has improved, the State provided

sufficient evidence that Mother's mental illness still renders her unable to adequately care for S.F.'s needs.

*2. Physical, mental, or emotional abuse or neglect, or sexual abuse of a child (K.S.A. 2020 Supp. 38-2269[b][4]).*

The sole evidence supporting this factor is Mother's admission to kicking the six-month-old child when she was crying in her bouncer. S.F. flew up in the bouncer but did not fly out of the bouncer. This incident occurred prior to the time that she was placed in DCF custody. It amounts to uncontroverted evidence that an isolated incident of physical abuse occurred about four years prior to the termination proceedings. Accordingly, this factor does not sustain a finding of *present* unfitness or evidence that Mother's conduct in accordance with this factor is unlikely to change in the foreseeable future.

*3. Lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or condition to meet the needs of the child (K.S.A. 2020 Supp. 38-2269[b][8])*

The State presented sufficient evidence to support the district court's finding that Mother failed to adjust her circumstances, conduct, or condition to meet the needs of the child. In trying to undermine the evidence Mother points to ways in which she did adjust her circumstances and highlights the progress that she made on individual case plan tasks, such as finding a suitable apartment and fulltime employment. As further support for her argument, Mother tries to direct our attention to programs and services that she believes would have been beneficial to her reintegration efforts. It is not lost on us that Mother did complete a portion of her case plan tasks. Even so, the evidence before the district court reflected that S.F. spent nearly four years in the State's custody and during that time Mother's progress toward reintegration was minimal at best. The fulfillment of limited tasks does not rise to the level of the progress required to bring her closer to reintegration.

The district court heard evidence that Mother's pervasive mental health struggles were a considerable hurdle for her in achieving reintegration. Nevertheless, the evidence reflected that Mother failed to attend individual therapy and take her medication as needed to stabilize her mental health. Additionally, Mother neglected to maintain consistent contact with the agency, did not pursue an increase in her visitation time with S.F., and did not prove the ability to successfully care for the child for any lengthy period of time. The State presented clear and convincing evidence that Mother failed to adjust her circumstances, conduct, or condition to meet the needs of the child.

*4. Failure to maintain regular visitation, contact, or communication with the child or with the custodian of the child (K.S.A. 2020 Supp. 38-2269[c][2]).*

Mother points to evidence in the record highlighting the agency's failures in communication and recordkeeping. Yet she also admits she did not consistently maintain contact with the agency. She claims those periods of time are not necessarily indicative of a corresponding lack of contact with S.F. Still, the evidence before the district court established that Mother cancelled visits with S.F., cut their visits short, or otherwise failed to adhere to an official visitation structure with the child. For example, at the time of termination, Mother's visits with S.F. occurred only when the grandmother took Mother to appointments or to run errands. The record reflects that her last official visit with the child occurred in February 2020, which was five months before trial. Mother's assertion that the agency exhibited shortcomings in communication does not invalidate the uncontroverted evidence that she failed to maintain regular contact and communication. The district court's finding that Mother failed to maintain regular visitation, contact, or communication with the child is supported by clear and convincing evidence.

*5. Failure to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home (K.S.A. 2020 Supp. 38-2269[c][3]).*

The court received extensive evidence that Mother failed to carry out a reasonable plan directed toward the reintegration of S.F. into the parental home. Mother points to several examples which she contends reveal the completion of case plan tasks, an improvement in her parenting skills, and progress towards reintegration. She also asserts that the specialists most recently assigned to her case believed that she should be afforded more time to achieve reintegration. But the district court found those witnesses lacked credibility because they were not involved in the history of the case. The standard of review to which we are bound prohibits us from reassessing the credibility of those witnesses. *In re K.L.B.*, 56 Kan. App. 2d at 445. The evidence presented to the district court also included testimony from several professionals which established that while Mother had a history of completing case plan tasks, she often regressed and did not make further progress toward reintegration. Those witnesses repeatedly expressed concern about how long S.F. had been in the State's custody without making much progress toward reintegration, and they noted that the child needed permanency. Finally, the uncontroverted evidence before the court was that Mother was consistently unable to care for S.F. for longer than a few hours at a time. Without this ability, Mother was unable to prove that she could increase her visitation and eventually take over the daily care of the child. This key shortcoming evidenced that Mother failed to carry out a reasonable plan directed toward S.F.'s reintegration into the home.

In summary, S.F. entered DCF custody when she was only six months old. Mother made some measure of progress on her case plan tasks, unfortunately, the changes she made did not firmly take root and she was unable to sustain the growth required to make reintegration a reality. Most notable was that Mother's participation in therapy ebbed and flowed even though her mental health issues were the primary hurdle to reuniting with her daughter. Accordingly, we find the evidence strongly supports the district court's

conclusion that Mother's mental illness rendered her unable to care for the ongoing physical, mental, and emotional needs of the child. Mother showed a lack of effort to adjust her circumstances, conduct, or condition to meet the needs of the child, she failed to maintain regular visitation, contact, or communication with the child, and Mother failed to carry out a reasonable court-approved plan aimed at reintegration.

In making its decision, the district court acknowledged that S.F. had been out of the home for about four years and needed permanency as well as a stable home. The district court properly determined that based on the evidence presented, Mother was presently unfit, and her conduct was not likely to change in the foreseeable future. It identified that "child time" was a critical factor in the analysis and, in that vein, during the preceding four years Mother never reached a point where she could provide continual care for her child. In arriving at its decision, the court stated:

> "This child has a right to permanency within a time frame reasonable for her own well-being. See *In re M.H.*, 50 Kan. App. 2d [1162,] 1170-71[, 337 P.2d 711 (2014)]. In light of mother's past inability to parent this child along with her other failures in completing case plan tasks, the uncertainty created by mother's failure to parent [the] child for a substantial period of time, the lengthy amount of time necessary for [Mother] to eventually care for her child, and this court considering this issue in terms of 'child time' rather than 'adult time,' this court finds the evidence clear and convincing and sufficient to convince a rational fact-finder to find it highly probable that the mother's conduct or condition is unlikely to change in the foreseeable future."

Mother challenges the district court's finding that her unfitness was unlikely to change in the foreseeable future. In essence, Mother is requesting that we reweigh the evidence presented to the district court. That is not our role.

There is no set amount of time that constitutes the "foreseeable future." Kansas measures this time "from the child's perspective, not the parent['s], as time perception of a

18

child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009); see K.S.A. 2020 Supp. 38-2201(b)(4). This court has considered periods of time as short as seven months to be the foreseeable future from a child's perspective. 41 Kan. App. 2d at 790. Children have the right to permanency in a time frame reasonable to them. In making this determination, the court may look to the parents' past conduct—as the district court did in this case—as indicative of future behavior. See *In re K.L.B.*, 56 Kan. App. 2d at 447.

The record reflects that Mother loves and shares a bond with S.F. Even so, the child was removed from the home and placed in her grandmother's care in June 2016 where she remained until Mother's rights were terminated four years later. Viewing the evidence in a light most favorable to the State, we find clear and convincing evidence to support the district court's findings that Mother's unfitness was unlikely to change in the foreseeable future.

*The district court did not abuse its discretion in finding that termination of parental rights was in the best interests of the child.*

Mother also challenges the district court's finding that termination was in the best interests of the child. She argues that harm occurs when a child is separated from his or her parent, and the district court should have considered a guardianship rather than termination. But Mother did not raise this argument to the district court, and it is not our role to determine whether a guardianship would have been more appropriate. Once the district court finds that a parent is unfit and the condition of unfitness is unlikely to change in the foreseeable future, it must determine whether termination of parental rights is in the best interests of the child involved. K.S.A. 2020 Supp. 38-2269(g)(1). Under the statute, in making that determination, the court must give primary consideration to the physical, mental, or emotional health of the child. K.S.A. 2020 Supp. 38-2269(g)(1).

19

The determination of the best interests of the child is entrusted to the district court's sound judicial discretion based on a preponderance of the evidence. As a result, our review of this determination is for an abuse of that discretion. *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 994 (2019); *In re K.R.*, 43 Kan. App. 2d 891, 903-04, 233 P.3d 746 (2010). A district court abuses its discretion if it bases its decision on an error of fact or law or if no reasonable person would agree with its decision, and the party asserting an abuse of discretion bears the burden of showing it. *In re P.J.*, 56 Kan. App. 2d 461, 465-66, 430 P.3d 988 (2018). The court should weigh the benefits of permanency for the child without the presence of a parent against the continued presence of the parent and the attendant issues that parental presence creates in the child's life.

In its ruling, the district court noted that Mother cares deeply for the child but found it significant that Mother had not consistently sought to parent the child in a manner that demonstrated she was ready for reintegration. It pointed to evidence of Mother's continued mental health struggles and noted that S.F. "needs a parent who is mentally stable and can provide for all of her needs." The court also expressed concern that reintegrating the child with Mother after such a long time period would be potentially emotionally harmful to S.F., noting that she is bonded with her grandmother and is "receiving the best possible care with her maternal grandmother."

The district court considered the emotional, physical, and psychological needs of the child, her need for permanence in a stable home, and the recommendations of the professionals closest to the case. The district court also considered the passage of time here from the child's perspective, and that consideration is in line with Kansas caselaw and guidance provided by the Legislature through K.S.A. 2020 Supp. 38-2201(b)(4). Considering the record, we have no difficulty concluding that the district court did not abuse its discretion in finding that termination of parental rights was in the child's best interests. A rational factfinder could have found that delaying permanency would not be in S.F.'s best interests in this case.

We acknowledge that the loss of parental rights is both tragic and sobering. There is no doubt that Mother cares for S.F. very deeply, but this case is not about Mother's love for her daughter. It is about the impact her mental health issues have on her ability to effectively nurture and care for S.F. The agency emphasized that Mother's struggles with her mental health were the main issue preventing Mother from achieving significant steps toward parenting S.F. in a meaningful, healthy way. Yet those issues continued to occur without successful redress. This is a difficult case because Mother has the skills to parent, but her illness simply would not allow her to commit to a treatment regimen that would enable her to prevent those issues from interfering with her capabilities. The unfortunate truth is Mother could not capitalize on the opportunities and resources available to her.

In summary, viewed in the light most favorable to the prevailing party, we conclude there is clear and convincing evidence to support the district court's finding of unfitness and that the conduct or condition rendering Mother unfit to care for S.F. was unlikely to change in the foreseeable future. In addition, Mother fails to show that the district court abused its discretion in ruling that termination of her parental rights was in the child's best interests. We therefore affirm the district court's order terminating Mother's parental rights.

Affirmed.